# THE CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY

v.

## MARTIN CASEY, Adm'r.

1. MASTER AND SERVANT—LIABILITY FOR TORTS.—In order to make a master liable in tort for an injury caused by the wrongful or negligent act of his servant, it must appear that the act was within the actual or apparent scope of the servant's authority. If the servant was not acting in the due course of his employment, but in contravention of his duty, and against his master's interest, the master is not liable.

2. RAILROAD ENGINEER—DUTIES—AUTHORITY.—The place of an engineer is on his engine, and his duties and authority, so far as respects the management of the train, are subordinate to the conductor. An engineer has no authority to permit persons to ride upon the train, and the granting of any such permission by him is an act beyond the scope of his employment, and for which the railroad company cannot be held liable.

3. KNOWLEDGE OF MANNER IN WHICH TRAINS ARE OPERATED PRESUMED.—The system by which railroad companies conduct their business ha b en so l ng in operation, and s con lucted with such a degree of uniformity, that its gen ral featu es must be presumed to be known and understood by the public, an l the sco e of the servants' apparent authority cannot be made to depend upon the ignorance or want of expe.ience of particular individuals, but upon the presumptions which the public at large have a right to dra v from their general knowledge of the powers usually exercised by persons occupying their positions.

APPEAL from the Circuit Court of Cook county; the Hon. JOHN G. ROGERS, Judge, presiding. Opinion filed January 26, 1882.

This was an action on the case, brought by Martin Casey, administrator of John Casey, deceased, against the Chicago, Burlington and Quincy Railroad Company, to recover damages for the death of said John Casey, caused, as is alleged, by the negligence of the defendant. The facts, as disclosed by the evidence, are as follows: On the 14th day of September, 1878, at about nine o'clock in the forenoon, the deceased, then a boy between twelve and thirteen years old, and two companions, James Scully, aged fourteen years, and Joseph McDonald, aged twelve years, started out together from their homes in the city of Chicago, on an expedition into the country in quest of apples and nuts. They walked along the defendant's railroad track from Chicago to Lawndale, a distance of five or six miles, then turned into Ogden avenue, leading to Riverside, and after walking some distance, gathering a few apples by the way, they were overtaken by a farmer, who gave them a ride to Riverside, twelve miles west of Chicago. After reaching that place, the boys, being weary, went to the defendant's passenger station, and sat down on the platform. As they reached the station, or just before, Casey suggested that they get a ride back to the city on one of defendant's trains; and during the time they were there, the matter was discussed between them at some length, the project being favored by Casey and McDonald, and opposed by Scully.

The passenger station stood on the south side of the track, and about sixty feet west of a street crossing the railroad at right angles. The platform extended from a point a little west of the station to the line of the street. In front of the building it was elevated about two feet above the level of the track, and thence running east, it gradually sloped down to the grade of the street. On the same side of the track, and immediately east of the street, was what was called a milk platform, used for loading cans of milk into the defendant's cars, it being similar to other structures on this and other lines of road used for the same purpose. It was built higher than the other platform, so as to be nearly or quite on a level with the floors of the cars, and stood about three and one-half feet from the track, thus leaving a space of only from eighteen to twenty inches between it and the sides of freight cars passing on the track.

The boys remained on or about the platform from fifteen minutes to half an hour, during which time one or more trains passed the station going west. At length a long freight train, consisting of from thirty-five to thirty-eight cars, known as the "Omaha freight," arrived from the west and stopped to take water at a water-tank situated some sixty or seventy rods west of the station. It was thereupon proposed among the boys that they attempt to get a ride on this train. After taking water, the train started east, and was moving at a constantly increasing rate of speed, so that by the time it reached the station it was running, according to the various estimates of the witnesses, at from five to nine miles an hour. As the engine passed where the boys were standing, Scully called out to the engineer, who was on the right hand side of the engine looking out of the window, asking him whether he would give them a ride, and, as Scully and McDonald both testify, received from him an affirmative answer. The engineer, on the other hand, swears that his answer was in the negative. Casey thereupon ran down the slope of the platform and jumped on to a ladder on the outside of the fifth or sixth car from the engine.

McDonald, also, in the same manner jumped onto a car two or three car-lengths in the rear of Casey, but Scully did not attempt to get on. As the car on which Casey was attempting to ride passed the milk platform, he was hanging out from the car with his feet on the first or second step of the ladder. and was struck by the platform and thrown down on to the track and instantly killed. McDonald, though not seeing the accident to Casey, dropped from the train in obedience to a warning from Scully, and thus escaped injury.

It appears that the deceased was born, and had lived all his life in the city of Chicago; also that he had attended the public schools of the city for several years, and was a boy of ordinary intelligence. His father, the plaintiff, was, and for many years had been, a bridge-tender at one of the draw-bridges over the Chicago river, and the deceased, for a considerable time before his death, assisted his father in tending the bridge, and after his death his father was compelled to pay an assistant twenty dollars per month, and board, for doing the same work.

It further appears that the train by which the deceased was killed was not an accommodation train, but was exclusively devoted to the transportation of freight. Also, that the defendant had adopted various rules for the government of its employes in the management of its trains, said rules being printed on the back of its time-cards issued, to its employes for their information. Of said rules, those material to this case are as follows:

"Rule 14. The conductor will have charge and control of the train, unless his orders shall conflict with these rules, or involve any danger, in which case all persons participating, will be held responsible.

"Rule 27. Engineers will not allow any person to ride on their engines, except by permission of the general superintendent, or assistants, or general master mechanic, except conductors and forward brakemen of freight trains, while on duty.

"Rule 43. Freight trains not run as accommodation trains, will take no passengers without special order from proper authority, and then only on regular tickets or passes."

On the question of negligence in the construction of the milk platform, the court, at the instance of the defendant, instructed the jury as follows:

"The jury are instructed that the defendant was under no legal obligation to construct its platforms so that accidents would not happen by reason of their construction, to persons hanging on the sides of its moving cars; and if the jury believe, from the evidence, that at the time of the accident the deceased was hanging on the side of a moving car of the defendant, and that being in that position, and by reason thereof he was struck by the milk platform, then the jury are instructed that the defendant is not liable by reason of the fact, if it be a fact, that the milk platform was improperly constructed, and in dangerous proximity to the track of the defendant company."

The jury by their verdict found the defendant guilty, and assessed the plaintiff's damages at $2,000, for which sum and costs the court, after overruling the defendant's motion for a new trial, gave judgment for the plaintiff.

Messrs. DEXTER, HERRICK & ALLEN, for appellant; that the company is not liable for the torts of its servant, outside of the course of his employment, cited Cooley on Torts, 535; Pierce on Railroads, 279; C. &. A. R. R. Co. v. Michie, 83 Ill. 427; Flower v. Pa. R. R. Co. 69 Pa. St. 210; Duff v. Allegheny R. R. Co. 91 Pa. St. 458; Snyder v. H. & St. J. R. R. Co. 60 Mo. 413; Sherman v. H. & St. J. R. R. Co. 72 Mo. 63; Hoar v. M. C. R. R. Co. 70 Me. 65; Eaton v. D. & L. & W. R. R. Co. 57 N. Y. 382; Towanda Coal Co. v. Heeman, 86 Pa. St. 418; Cauley v. P. C. & St. L. R. R. Co. 2 Am. & Eng. R. R. Cas. 4.

It was the duty of the court, under the admitted facts in this case, to instruct the jury to find for the defendant: Pierce on Railroads, 319; Poleman v. Johnson, 84 Ill. 269; Phillips v. Dickerson, 85 Ill. 11; Scates v. C. & N. W. R. R. Co. 90 Ill. 586.

The act of the deceased was a violation of a public statute, directly contributing to the injury: Rev. Stat. Chap. 114, § 17; Frye v. C. B. & Q. R. R. Co. 73 Ill. 399; Harris v. Hatfield, 71 Ill. 298; Heland v. City of Lowell, 3 Allen, 407.

Deceased was guilty of such contributory negligence as to bar a recovery: Reynolds v. N. Y. C. & H. R. R. R. Co. 58 N. Y. 248; Acthagen v. City of Watertown, 18 Wis. 331; Brown v. E. & N. A. R'y Co. 58 Me. 384; R. R. I. & St. L. R. R. Co. v. Delaney, 82 Ill. 198; St. Clair v. Berndt, 87 Ill. 174.

Messrs. LAWRENCE, CAMPBELL & LAWRENCE, and Mr. W. J. HYNES, for appellee; that if a servant commits a tort when not necessary for the performance of the service required of him, or makes a tortious use of his position, the master is liable, cited T. W. & W. R. R. Co. v. Harmon, 47 Ill. 298; C. B. &. Q. R. R. Co. v. Parks, 18 Ill. 460; C. B. & Q. R. R. Co. v. Dickson, 63 Ill. 151; Higgins v. Watervleit Turnpike Co. 46 N. Y. 23.

Upon the effect of the permission to ride, given by the engineer to deceased: L. & B. R. R. Co. v. Chenewith, 52 Penn. 382; Powell v. Penn. R. R. Co. 32 Penn. 417; Wilton v. Mid-

C. B. & Q. R. R. Co. v. Casey.

dlesex R. R. Co. 107 Mass. 108; Ramsden v. Boston & Albany
R. R. Co. 104 Mass. 117; P. Ft. W. & C. R. R. Co. v. Bum-
stead, 48 Ill. 221.

The doctrine that a trespasser is not entitled to protection,
is not the law in Illinois: T. W. &. W. R. R. Co. v. Ferguson,
42 Ill. 449; T. P. &. W. R'y Co. v. Bray, 57 Ill. 517.

A person has the right to act upon the statement of any
employe connected with the operation of a train: Ill. Cent. R.
R. Co. v. Slatton, 54 Ill. 133; O. & M. R. R. Co. v. Stratton,
78 Ill. 88; C. B. & Q. R. R. Co. v. Sykes, 2 Am. & Eng. R.
R. Cas.

The company is chargeable with negligence in respect to the
milk platform.    C. & N. W. R. R. Co. v. Jackson, 55 Ill. 492;
C. & I. R. R. Co. v. Russel, 71 Ill. 298; C. & N. W. R. R.
Co. v. Swett, 45 Ill. 197; C. B. & Q. R. R. Co. v. Gregory, 58
Ill. 272; Ill. Cent. R. R. Co. v. Middleworth, 46 Ill. 494; T.
P. & W. R'y Co. v. Bray, 57 Ill. 514.

The fact that deceased may have been violating a public
statute is no bar to a recovery: Mahoney v. Cook, 26 Pa. St.
342; R. R. Co. v. Towboat Co. 23 How. 209; Sutton v. Wau-
watosa, 29 Wis. 21; I. & St. L. R. R. Co. v. Peyton, 76 Ill.
340; Worcester v. Essex M. Bridge Co. 7 Allen, 457.

Deceased was not guilty of such contributory negligence as
will bar a recovery: Kerr v. Forgue, 54 Ill. 482; Hund v.
Geier, 72 Ill. 393; Weick v. Lander, 75 Ill. 93; T. W. & W. R.
R. Co. v. Miller, 76 Ill. 278; C. B. & Q. R. R. Co. v. Dewey,
26 Ill. 255; O. & M. R. R. Co. v. Stratton, 78 Ill. 88; C. & A.
R. R. Co. v. Murray, 71 Ill. 601; R. R. Co. v. Gladman, 15
Wall. 401; R. R. Co. v. Sweet, 17 Wall. 675; O'Mara v. H. R.
R. R. Co. 38 N. Y. 445.

Bailey, J.   The defendant in this case is charged with neg-
ligence; first, in constructing its platform known as the
"milk platform," and allowing it to remain in dangerous
proximity to its railroad track; and, secondly, in giving per-
mission to the plaintiff's intestate and his companions to get
upon the train while it was in motion.   These two charges are
distinct from each other, and depend upon entirely different
proofs, and they are therefore to be considered separately.

In relation to the first charge, the court instructed the jury, in substance, that the defendant was under no legal obligation to so construct its platforms as to obviate liability of injury therefrom to persons hanging on the sides of its moving cars, and that if the deceased was injured in consequence of a collision with the platform in question while in that position, the defendant was not liable by reason of the fact, if such be the fact, that the platform was improperly constructed and in dangerous proximity to the defendant's track. It being undisputed that the plaintiff's intestate received his injury in the manner here supposed, the instruction amounted to a decision by the court that, under the facts appearing in evidence, the plaintiff could not avail himself of any negligence in the construction or maintenance of the platform; thus, in effect, withdrawing from the jury all consideration of the first of the above charges of negligence. Without pausing to consider whether this instruction stated the law correctly or not, we are bound to presume that the jury obeyed it, and their verdict must be deemed to have been based solely upon the other charge of negligence. In determining, then, whether the verdict is supported by the evidence, we are limited, so far as the defendant's negligence is concerned, to that part of the evidence which relates to the alleged permission given by the defendant's engineer to the plaintiff's intestate and his companions to get on to the train while in motion.

Although the engineer denies giving any such permission, and swears that his answer to the boy's request was a refusal, and a warning to them to keep off, still, as the evidence on that point was conflicting, the verdict of the jury must be regarded as a conclusive determination of the question of fact thus raised, in favor of the plaintiff. On this branch of the case the only point open for discussion is, whether his giving the boys permission to ride was an act for which his employers, the railroad company, can be held responsible.

The rule undoubtedly is, that in order to make a master liable in tort for an injury caused by the wrongful or negligent act of his servant, it must appear that the act was within the actual or apparent scope of the servant's authority; for if the

C. B. & Q. R. R. Co. v. Casey.

servant was not acting in the due course of his employment for his master, but in contravantion of his duty to him and against his interest, the master is not liable.    Addison on Torts, § 1809.    In Cooleyon Torts, 535, the rule is stated thus:  " The liability of the master for intentional acts, which constitute legal wrongs, can only arise when that which is done is within the real or apparent scope of the master's business.    It does not arise where the servant has stepped aside from his employment to commit a tort, which the master neither directed in fact, nor could have been supposed, from the nature of his employment, to have authorized or expected the servant to do." In another place the same learned author says:   " The master is liable for the acts of his servant, not only when they are directed by him, but also when the scope of his employment or trust is such that he has been left at liberty to do, while pursuing or attempting to discharge it, the injurious act complained of.    It is not merely for the wrongful acts he was directed to do, but for the wrongful acts he was suffered to do, that the master must respond."    Page 534.    But, as was said by the Supreme Court of Missouri, in Snyder v. Han. & St. Jo. R. R. Co. 60 Mo. 412, "The mere fact that a tortious act is committed by a servant *while* he is actually engaged in the performance of the service he has been employed to render, cannot make the master liable.    Something more is required.    It must not only be done while so employed, but must pertain to the particular duties of that employment."

Applying these principles to the facts before us, we are brought to the conclusion that the engineer, in giving permission to these boys to ride, was not acting within the scope of his employment, and consequently that his act is not one for which the railroad company can be held liable.    It is not pretended that the engineer had any actual authority from the company to give such permission.    Not only is there an entire absence of proof of such authority, but the evidence, so far as it bears on that subject, is all the other way, and shows beyond question that his act was in direct and palpable violation of the express rules laid down by the company for the government of its employes.    By one of these rules it was provided

that trains of the class to which the one in question belonged should take no passengers without a special order from proper authority, and then only on regular tickets or passes. None of these conditions existed here, and so the acceptance of passengers by any of the employes was forbidden. By another rule the charge and control of the train was committed to the conductor, and by still another, the engineer was prohibited from allowing any persons, with certain specified exceptions, to ride on his engine.

Was the authority to give this permission within the apparent scope of his employment? Third persons are not bound to inform themselves of private instructions given by an employer to his employes, and so, in the absence of express notice, they have a right to presume that servants in a particular employment have the same authority, which persons employed in the same capacity usually have. This is what is meant by their apparent authority. It is based upon those presumptions which the public have a right to draw from the usual course of business in matters of a similar nature, or, in other words, from general knowledge and observation of the powers and duties ordinarily intrusted to servants employed to fill the same station.

The system by which railway companies conduct their business of carrying passengers and freight, has now been so long in operation, and is being conducted with such a degree of uniformity, that its general features must be presumed to be known and understood by the public. Among these, may be mentioned the division of their freight and passenger business into two distinct departments, and the admission of passengers upon freight trains only under well known limitations and restrictions, or their entire exclusion therefrom. Another is, the assignment to their respective and definite duties of the various employes on their trains. It is a fact with which the public must be presumed to be familiar, that the employes of an ordinary railway train, consist of a conductor, an engineer and one or more brakemen, and that each of these is charged with his own peculiar duties and powers. The conductor is the superior officer, and has general charge and control of the

C. B. & Q. R. R. Co. v. Casey.

train, admitting and discharging passengers, collecting fares, receiving and discharging freight, and directly representing the company in its intercourse with the public.   The duties of the engineer are subordinate, and of an entirely different character.   His place is on his engine, and no where else, and his duties are limited to running and managing his engine. With the admission or discharge of passengers he has nothing to do, except so far as the proper management of his locomotive may furnish them an opportunity for getting on and off the train.   No authority beyond this can be inferred from the usual course of business on railway trains, or from the powers which locomotive engineers usually have and exercise.

The case of C. & A. R. R. Co. v. Michie, Adm'x, 83 Ill. 427, is authority for what we have here said.   In that case the deceased, at the time he was killed, was riding on the engine by permission of the engineer, and the court, in holding that the relation of carrier and passenger was not thereby established, say:   " The permission of the engine-driver, if given, was not the permission of the company, as he had no power to give it.   Had the conductor of the train given the permission, or, knowing the deceased was upon the engine, suffered him there to remain, it might be considered the act of the company.   The driver of the engine occupies a different and a very subordinate position.   He has no right to say who shall be upon the train, or to take cognizance of such as may be upon it.   He is to look to his engine, and keep it in order, and permit no one to ride upon it without the permission of his superior."

The engineer, then, in giving the boys permission to ride, acted not only without actual authority from the company, but also without any authority, which third persons had a right to infer from the nature and circumstances of his employment; in other words, without any apparent authority.   This conclusion is greatly fortified by the fact already noticed, that the train in question was a freight train, upon which, according to the rules of the company, no passengers were permitted to ride.   That the company had a right to run trains of this character, cannot be questioned.   I. C. R. R. Co. v. Nelson, 59 Ill.

112.   The transportation of passengers was entirely foreign to the business which the train hands were employed by the company to transact.   Had even the conductor given the boys permission to ride on such a train, it is, to say the least, doubtful whether *his* act would not have been beyond the scope of his employment, so as to prevent an application of the maxim *respondeat superior*.   But certainly the engineer, whose duties were limited to driving the engine by which such a train was propelled, could not, by any possible implication, be clothed with authority to give such permission.

We have examined the various decisions of our Supreme Court, to which our attention has been called, bearing upon the question of the liability of railroad companies for torts committed by their employes, and fail to find any case at variance with the views we have expressed.   These cases hold, it is true, that the company may be liable, although the particular act complained of is unauthorized by the company, or is contrary to its express instructions, or even in violation of law, if it appears, first, that it was done in the course of the agent's performance of a duty or business, and second, that such duty or business was within the scope of the agent's employment.   Thus, if an engineer after being put in possession of his engine, uses it so unskillfully as to occasion injury to another, or willfully perverts it to the purpose of wanton mischief, the company is liable.   T. W. & W. R. R. v. Harmon, 47 Ill. 298;   C. B. & Q. R. R. Co. v. Dickson, 63 Id. 151.   So, where a conductor committed a trespass by wrongfully ejecting a passenger from a car.   St. L. A. & C. R. R. Co. v. Dalby, 19 Ill. 353.   So also where a servant of the company, whose duty it was to keep persons out of a car, while in the discharge of such duty, kicked the hand of a boy who was climbing on the car, whereby he fell under the cars and was killed.   N. W. R. R. Co. v. Hack, 66 Ill. 238.   Also where a freight conductor, whose train stood between a station and a passenger train, instead of separating his train, as was his duty, told a passenger to go under it, whereby he was injured.   C. B. & Q. R. R. Co. v. Sykes, 96 Ill. 162.   In all these cases the wrongful act appertained to the duties or business the

agent was employed to do, and was done under color of his employment. But we fail to find any case which holds that the principal can be held liable for an act done in a matter outside of, and foreign to the agent's employment, even though the agent may, at the same time, have been in the performance of other acts within the scope of his proper authority.

Much stress is laid by counsel for the appellee upon the fact that the deceased was a mere boy, and not of sufficient maturity to be presumed to know or understand the precise nature of the relative duties of the several employes on the train, and that therefore, as to him, the permission to ride given by the engineer should be regarded as within the scope of that servant's employment. To this view we are unable to yield our assent. The scope of the servant's apparent authority cannot be made to depend upon the ignorance or want of experience of particular individuals, but upon the presumptions which the public at large have a right to draw from their general knowledge of the powers usually exercised by persons occupying the same station. The ignorance of the deceased should doubtless be considered as bearing upon the question of his own contributory negligence, but cannot operate to enlarge the boundaries of the agent's authority. Flower v. Pa. R. R. Co. 69 Penn. St. 210. In that case the court, discussing this question, say: " Nor can the mere youth of the boy change the relations of the case. That might excuse him from concurring negligence, but cannot supply the place of negligence on the part of the company, or confer an authority on one who has none."

We think the evidence fails to support the second charge of negligence, and the verdict of the jury, therefore, cannot be sustained. Other questions are raised by counsel, but as what we have said is necessarily decisive of the case, we do not deem it our duty to consider them. The judgment will be reversed and the cause remanded.

Judgment reversed.